Mark JORDAN, Plaintiff,

v.

**WAREHOUSE SERVICES, INC., Defendant.**

No. Civ.A. 98–D–1001–N.

United States District Court, M.D. Alabama, Northern Division.

Jan. 18, 2000.

Thomas D. Simon, Montgomery, AL, Valerie M. Smedley, Montgomery, AL, for plaintiff.

Thomas S. Lawson, Jr., Barbara J. Gilbert, Montgomery, AL, Melvin R. Hutson, Greenville, SC, for defendant.

### MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court is Defendant Warehouse Services, Inc.'s ("WSI") Motion For Summary Judgment ("Mot.") along with its Memorandum In Support ("Mem."), both filed November 17, 1999. On December 13, 1999, Plaintiff Mark Jordan ("Plaintiff") filed a Response To Defendant's Motion For Summary Judgment ("Resp."). WSI filed a Reply Memorandum ("Reply") on December 20, 1999. After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that WSI's Motion For Summary Judgment is due to be granted in part and denied in part.

## I. JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), 42 U.S.C. §§ 2000e to 2000e–17 (Title VII of the Civil Rights Act of 1964, as amended) ("Title VII") and 42 U.S.C. § 1981 (Civil Rights Act of 1866, as amended) (" § 1981"). The Parties do not contest personal jurisdiction or venue.

## II. SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing FED.R.CIV.P. 56(c)).

The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for

trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' " that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (citing FED. R.CIV.P. 56(c)). The mechanics of satisfying the initial burden vary, however, depending upon which party, the movant or the nonmovant, bears the burden of proof at trial. *See Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993) (detailing the nature of the parties' responsibilities when preparing or defending against a motion for summary judgment).

Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (citing FED.R.CIV.P. 56(e)). In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." FED.R.CIV.P. 56(e); *see also Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348; *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

## III. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff, a black male, worked for WSI from August 16, 1996 until his termination on January 15, 1998. (Am.Compl. ¶¶ 5, 7; Combs Aff. ¶¶ 16, 18.[1]) WSI provides transportation services and operates warehouses for General Electric ("GE") at GE's facility in Burkville, Alabama. (Combs Aff. ¶ 4.) Among other things, GE ships plastic powder from its Burkville plant in "regular over-the-road trailers." (*Id.* ¶ 5.) WSI's employees line these trailers with plastic film to protect GE's product and the trailers during transportation. The employees who perform this function are referred to as the liner crew. (*Id.*)

WSI initially hired Plaintiff as a part-time employee to work on its liner crew. In January 1997, Plaintiff received a full-time position on the liner crew and was promoted to the position of "head liner." (*Id.* ¶ 16, Exs. 3, 4[2]; Pl.'s Dep. at 16.) Plaintiff worked in this position until he was fired for allegedly violating WSI's policies. (Combs Aff. ¶¶ 16, 19, Ex. 12.)

WSI has promulgated written policies, which apply to all hourly employees, including Plaintiff. "Policy 6.01" is titled "Rules of Personal Conduct." (*Id.* ¶ 21, Ex. 30.) Pertinent to this action are the following two sections of Policy 6.01:(1) § 6.01–I–F, which provides that "[w]illful falsification of time card or other company

---

**1.** William J. Combs ("Combs") is WSI's Site Manager. (Combs Aff. ¶ 3.) His Affidavit ("Aff.") is Exhibit A to WSI's Motion.

**2.** Combs attached 33 exhibits to his Affidavit. In citing these exhibits, the court will first reference Combs' Affidavit, followed by the exhibit number.

documents" will result in "immediate termination" ("WSI Policy, § 6.01–I–F'") (*Id.*); and (2) § 6.01–II–J, which provides that "[l]eaving the facility during working hours without permission" will "result in disciplinary action varying from oral warning to written warning to termination, depending upon the nature of the offense" ("WSI Policy, § 6.01–II–J"). (*Id.*)

To enforce its policies, WSI has a progressive discipline system, which is set forth in "Policy 6.03." (Mem. at 3; Combs Aff. ¶ 21, Ex. 32.) An infraction of WSI's policies ordinarily is met first with a verbal warning. Subsequent infractions generally result in a written warning. (Combs Aff. ¶ 21, Ex. 32.) However, no set number of verbal warnings mandates a written warning. At the supervisor's discretion, successive written warnings can result in "probation," "suspension" or "discharge."[3] (*Id.*)

On September 16, 1997, Plaintiff received an oral warning regarding his attendance. The oral warning is memorialized in a "Conversation With Employee Form." (*Id.* ¶ 19, Ex. 9.) This document describes instances in which Plaintiff called in sick or left early without completing his work.[4] (*Id.*) Plaintiff refused to sign the form. (*Id.*)

Subsequently, on November 7, 1997, Plaintiff received a written "First Warning," which states as follows:

> On 9/16/97 [Plaintiff] was issued a conversation for the [number] of days he has called in or left w/out completing his job. On 11/6/97 [Plaintiff] left without completing his job. On 11/6/97, [Plaintiff] left work and had 9 more trailers to line. He also failed to notify anyone that he was leaving and his work was not done.

(*Id.* ¶ 19, Ex. 10.) Plaintiff also refused to sign this form. (*Id.*)

Subsequently, on or about December 12, 1997, Plaintiff filed a charge of discrimination against WSI with the Equal Employment Opportunity Commission ("EEOC").[5]

---

**3.** Specifically, Policy 6.03, titled "Disciplinary Action," states as follows:

1. The following disciplinary actions are available to supervisors:

a. *Oral Warning*—Normally used for minor infractions of rules of conduct. Oral warnings should be recorded on a conversation with employee form ... and filed in the employee['] file.

b. *Written Warning*—Used for more serious infractions of rules of conduct or repetition of minor infractions.... A written warning must be discussed with the employee. Employees and supervisors should sign form. If the employee refuses to sign, another supervisor should witness his or her refusal to sign.

c. *Discharge*—Three (3) written warnings on different subjects or two (2) written warnings on the same subject within a twelve (12) month period may or will subject an employee to termination. When an employee commits a major offense justifying immediate discharge, the supervisor should normally remove the employee from the job and consult with his or manager before effecting the termination.

d. *Probation*—At management's discretion, an employee may be placed on probation because of conduct or work performance. The employee will be reviewed

during and at the end of the probation period. If an employee satisfactorily completes the probationary period, he or she will be returned to regular employee status. However, if the employee fails to improve during the probationary period, he or she may be discharged....

e. *Suspension*—Under certain circumstances, because of conduct or work performance or in connection with the company's Substance Abuse Prevention Process, and at management's discretion, employees may be sent out or suspended for a period of time without pay.

2. When an employee is discharged for cause, complete details of the separation must be recorded and filed in the employee's personnel file.

(Combs Aff. ¶ 21, Ex. 32.)

**4.** The "Conversation With Employee Form" states, in part, as follows: "[Plaintiff] called in sick on 7/29, 8/8 [Plaintiff] left after 5 hrs, 8/14 [Plaintiff] left @ 2 p.m.—8 more to line, 8/28 [Plaintiff] left @ noon, and on 9/16 [Plaintiff] called in sick...." (Combs Aff. ¶ 19, Ex. 9.)

**5.** The court notes that the EEOC charge has not been submitted as part of the record. Thus, the court does not know what allegations were included in this charge.

(Am.Compl.¶ 10.) WSI received notice of Plaintiff's charge "a few days later." (Mem. at 12.)

Approximately one month after the EEOC notified WSI of Plaintiff's EEOC charge, WSI fired Plaintiff. (Combs Aff. ¶ 16; Brooks Aff. ¶ 4.[6]) The events surrounding Plaintiff's termination are as follows:[7] Plaintiff was scheduled to work from 7:00 a.m. to 8:00 p.m. on Friday, January 2, 1998. (Pl.'s Dep. at 43; Brooks Aff. ¶¶ 7, 10.) When Plaintiff arrived at work on January 2, 1998, his supervisor told him to turn in his time card that morning, instead of the following Monday.[8] Thus, Plaintiff had to estimate his hours to be worked that day and the following Saturday and Sunday. (Pl.'s Dep. at 40–41; Brooks Aff. ¶¶ 16, 18.) As instructed, Plaintiff completed and turned in his time card. (Id.) On his time card, Plaintiff recorded that he worked the 7:00 a.m. to 8:00 p.m. shift on January 2, 1998. (Brooks Aff. ¶ 18, Ex. 7 (attachment).) Later that day, however, Plaintiff saw a schedule "posted ... on the wall at gate nine," which reflected that his shift had been changed and ended at 5:00 p.m., not 8:00 p.m. (Pl.'s Dep. at 30, 41–42.) Upon seeing other employees leave at 5:00 p.m. and believing that the gates were being locked, Plaintiff also left. (Id. at 30.) Plaintiff's supervisor told him, that because he had changed the schedule "at the last minute," he, the supervisor, would "take care" of changing Plaintiff's time card. (Id. at 42.)

Based on Plaintiff's conduct above, Plaintiff was suspended on January 8, 1998, pending an investigation. (Brooks Aff. ¶ 4.) WSI suspended Plaintiff based on its preliminary assessment that Plaintiff had left his shift early without permission, in violation of WSI Policy, § 6.01–II–J, and had willfully falsified his time card, in violation of WSI Policy, § 6.01–I–F. (Combs Aff. ¶ 21, Ex. 30.) Thereafter, Brooks "investigated" Plaintiff's alleged infractions. (Brooks Aff. ¶ 4; see also supra n. 6.) When questioned, Plaintiff admitted that he left work at 5:00 p.m. on January 2, 1998, but said that he was "confus[ed]" about his schedule. (Brooks Aff. ¶¶ 11, 14.) Plaintiff further stated that his time card incorrectly reflected that he worked until 8:00 p.m., because his supervisor required him to turn his time card in early with estimated shift hours. (Id. ¶¶ 14, 15; Pl.'s Dep. at 40–41.)

Brooks rejected Plaintiff's proffered reasons and "recommended" that Plaintiff be terminated. (Brooks Aff. ¶¶ 4, 5, 11, 14, 15.) During his investigation of Plaintiff's alleged infractions, Brooks "was aware" that Plaintiff had filed an EEOC charge against WSI. (Id. ¶ 5.) Brooks, however, states that he recommended Plaintiff's termination "for cause and not because of [h]is race or in retaliation for the filing of his EEOC charge." (Id.)

Brooks' "recommendation was accepted," and Plaintiff was terminated on January 15, 1998 (Id. ¶ 4; Combs Aff. ¶ 16.) On the day Plaintiff was fired, WSI issued Plaintiff two written warnings explaining the alleged infractions. (Combs Aff. ¶ 19, Exs. 11, 12.) The first written warning indicates that Plaintiff violated WSI Policy, § 6.01–II–J.[9] (Id. ¶ 19, Ex. 11.) The attachment to the warning states as follows:

---

6. Bart Brooks ("Brooks") is WSI's Manager of Industrial Relations. (Brooks Aff. ¶ 3.) His Affidavit ("Aff.") is Exhibit A to WSI's Reply.

7. While WSI and Plaintiff disagree on the material facts leading up to Plaintiff's termination, the court must view the record in the light most favorable to Plaintiff. See Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). Accordingly, the court recites the facts as alleged by Plaintiff.

8. Monday is the regularly-scheduled day for submitting time cards. (Brooks Aff. ¶ 16.)

9. This warning is classified as Plaintiff's "Second Warning" and preprinted on the form is the following: "Further unsatisfactory work will result in termination of your employment." (Combs Aff. ¶ 19, Ex. 11.) Plaintiff was issued his "First Warning," described supra, on November 7, 1997. (Combs Aff. ¶ 19, Ex. 10.)

"On 1/2/98 [Plaintiff] was scheduled to work from 7:00 a.m. to 8:00 p.m. His time card for the week ending 1/4/98 indicated he worked 7:00 to 8:00 p.m. We have reason to believe that he did not work until 8:00 p.m.

On 1/8/98 at 8:00 we had a conversation with [Plaintiff]. We ask[ed] him what time he left work on 1/2/98. [Plaintiff] stated 5:00 p.m. At this time we suspended [Plaintiff] without pay until further investigation.

[Plaintiff] recorded that he worked 7:00 a.m. to 8:00 p.m. on his time card. [Plaintiff] signed the time card and turned it in at the end of the pay period."

(*Id.*) Handwritten on the attachment is a note, presumably written by Plaintiff, which states as follows: "My supervisor required him. [sic] to complete my time card at the beginning of the week and turn it in so there would be no problems. Because December 1997 and had to turn in two cards for the next week." (*Id.*)

The second warning issued to Plaintiff on January 15, 1998 states that Plaintiff violated WSI Policy, § 6.01–I–F, "willful falsification of time card. . . ." (*Id.* ¶ 19, Ex. 12.) The form states that "[y]ou have been warned twice for failure to perform satisfactorily. These warnings were given on *11/07/97* and *1/15/98.* Your last day of work will be *1/15/98.*" (*Id.*) Attached to this warning is a copy of Plaintiff's time card and the following notation: "At this time [Plaintiff's] employment with WSI is terminated for the following. Receipt [sic] of three written warnings on different sub-

jects within a twelve month period," pursuant to WSI Policy, § 6.03–1–C, *supra* n. 3. (*Id.*) Plaintiff refused to sign both warnings. (Combs Aff. ¶ 19, Exs. 11, 12.)

On December 26, 1997, the week prior to Plaintiff leaving his shift early, two other liner crew employees, Steven Smith ("Smith") and Kelvin Moorer ("Moorer"), left work before completing their shifts. Neither Smith nor Moorer received permission from a supervisor. (Brooks Aff. ¶ 7; Pl.'s Dep. at 23; Jackson's Dep. at 40.) Smith, a white employee, was given an oral warning. (Brooks Aff. ¶ 7, Ex. 1.) This was Smith's first infraction of WSI policies. (*Id.*) The oral warning is recorded on a "Conversation With Employee Form," which states as follows:

On 12/26/97 you were scheduled to work from 7am to 8p.m. At 3:30 p.m. on 12/26/97[, you] left your work area and went home. This is in violation of WSI Policy 6.01–II–J[,] leaving the facility during working hours without permission. Anytime you leave the facility during working hours, for what ever [sic] reason you must obtain permission from your supervisor. Any further violation of this policy will result in a written warning.

(*Id.*)

Moorer, a black male, received a written warning, which was designated as a "First Warning." [10] (Brooks Aff. ¶ 8, Ex. 3; Pl.'s Dep. at 23.) Moorer had received a prior oral warning on November 7, 1997, for

---

**10.** In Plaintiff's Response, Counsel for Plaintiff asserts that Moorer and Smith are both white employees. (Resp. at 2.) However, Counsel for Plaintiff submitted no evidence to support this unsworn statement. On the other hand, WSI submitted Brooks' Affidavit, wherein Brooks represents that, while Smith is a "white" male, Moorer is a "black" male. (Brooks Aff. ¶¶ 7–8.) Plaintiff, in his deposition, also states that "Kelvin" is "black." (Pl's Dep. at 23.) Counsel for Plaintiff's unsworn statement regarding Moorer's race is not evidence and, thus, cannot be considered

in evaluating WSI's Motion For Summary Judgment. *See Oglesby v. Terminal Transport Co.,* 543 F.2d 1111, 1112 (5th Cir.1976); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").

leaving work without permission with Plaintiff.[11] (Brooks Aff. ¶ 8, Ex. 2.)

Based in part on Plaintiff's belief that he was treated unfairly as compared to Smith to Moorer, Plaintiff filed an amended charge with the EEOC on or about February 5, 1998. (Mot., Ex. F.) Therein, Plaintiff alleges a retaliatory discharge claim. Namely, Plaintiff states that he was "discharged in retaliation for filing a charge of discrimination" with the EEOC. (*Id.*) Plaintiff also alleges that, "[o]n a continuing basis, [he has] been discriminated against in terms and conditions of [his] employment because of [his] race, Black." (*Id.*) For instance, Plaintiff claims that he was "denied usages of [his] leave, and subjected to racially motivated remarks and discriminated against in reference to training, transfers, job announcements, and disciplinary actions." (*Id.*)

Plaintiff filed a Complaint in this court on September 3, 1998, and an Amended Complaint on January 7, 1999. In the "Factual Background" section of Plaintiff's Amended Complaint, Plaintiff sets forth the following three general categories of discrimination: (1) race discrimination under a disparate treatment theory, in that Plaintiff was "regularly discriminated against in the terms and conditions of his employment," including "pay, work hours, leave time, and disciplinary actions" (Am. Compl.¶ 8); (2) hostile work environment, in that Plaintiff was "regularly" the subject of "racial slurs and/or derogatory comments concerning the black race" (*Id.* ¶ 9); and (3) retaliation, in that WSI terminated Plaintiff's employment on January 15, 1998, "in retaliation for his filing of a [charge] with the EEOC," on December 12, 1997. (*Id.* ¶ 10.)

Plaintiff's Amended Complaint consists of five counts. In Count 1, Plaintiff asserts that the above-described conduct constitutes race discrimination and demonstrates a "pattern and practice" of race discrimination by WSI, all in violation of Title VII. (*Id.* ¶¶ 12–15.) In Count 2, Plaintiff alleges that, based on his race, he was subjected to harassment which resulted in a hostile work environment, in violation of Title VII. (*Id.* ¶¶ 16–20.) In Count 3, Plaintiff states that WSI fired him in retaliation for his filing a charge of discrimination with the EEOC. (*Id.* ¶¶ 21–24.) In Count 4, Plaintiff reasserts under § 1981 his claims alleging race discrimination "in the terms and condition of Plaintiff's employment," "pattern and practice" discrimination, and hostile work environment. (*Id.* ¶¶ 25–28.) In Count 5, Plaintiff further alleges that, in violation of § 1981, WSI retaliated against Plaintiff by firing him, because Plaintiff opposed WSI's "practices of discrimination and harassment and because he filed a charge of discrimination with the EEOC." (*Id.* ¶¶ 31–33.) As relief, Plaintiff seeks a declaratory judgment, back pay, front pay, compensatory damages, punitive damages, attorney's fees and costs. (*Id.* at 5–6.) Plaintiff also demands a jury trial. (*Id.* at 7.)

## IV. DISCUSSION

WSI raises three primary grounds in support of summary judgment. WSI's first ground is premised on the theory of abandonment. That is, WSI asserts that Plaintiff has abandoned all of his Title VII and § 1981 claims, except those relating to his termination. (Reply at 1.) As discussed in Section IV. B., the court agrees[12] and finds that Plaintiff has pre-

---

11. This oral warning, recorded on a "Conversation With Employee Form," indicates that Moorer left his shift "before all of the trailers were lined" and without "notifying any one [sic] that he was leaving." (Brooks Aff. ¶ 8, Ex. 2.)

12. Alternatively, WSI has addressed the merits of Plaintiff's claims unrelated to his termination. Because Plaintiff's Amended Com-

plaint contains only general allegations, not specific occurrences of alleged disparate treatment or harassment, WSI looked to Plaintiff's deposition "to try to determine the aspects of WSI's conduct which Plaintiff claims [are] discriminatory." (Mem. at 5.) From Plaintiff's deposition, WSI extrapolated several potential bases of alleged race discrimination, including the following: (1) WSI

served only the following claims: (1) the first being that WSI engaged in unlawful disparate treatment because of race when it discharged Plaintiff for allegedly violating WSI's policies, in violation of Title VII and § 1981 [13] ("discriminatory discharge" claim) (Counts 1 and 4); and (2) the second being that WSI retaliated against Plaintiff for filing an EEOC charge and for opposing WSI's alleged unlawful "practices of discrimination," in violation of Title VII and § 1981 ("retaliatory discharge" claim) (Counts 3 and 5). WSI's second and third grounds challenge the merits of Plaintiff's preserved claims. Namely, WSI contends that Plaintiff cannot establish a prima facie case of discrimination. Alternatively, WSI asserts that Plaintiff has failed to demonstrate pretext.

The court agrees with WSI as to some, but not all, of its contentions. As discussed in Section IV. C., below, the court finds that summary judgment is due to be granted on Plaintiff's discriminatory discharge claim, because Plaintiff has failed to make out a prima facie case of race discrimination. However, for the reasons enunciated in Section IV. D., below, the court finds that summary judgment is due to be denied on Plaintiff's retaliatory discharge claim. As to this claim, Plaintiff has established a prima facie case of discrimination and has raised disputed issues of fact on the issue of pretext. The court will now discuss the general principles applicable in Title VII and § 1981 actions and then will address each of WSI's three arguments.

### A. The Standard For Proving Intentional Discrimination Under Title VII And § 1981

 Plaintiff's claims are brought under both Title VII and § 1981. Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). Section 1981, in turn, "prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." [14] *Ferrill v. Parker Group*, 168 F.3d 468, 472 (11th Cir.1999). The allocation of burdens and elements of a prima facie case are the same for employment claims stemming from Title VII and § 1981. *See Richardson v. Leeds Police Dept.*, 71 F.3d 801, 805 (11th Cir.1995); *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994); *Howard v. BP Oil Co., Inc.*, 32 F.3d 520 (11th Cir.1994).

 The critical element in establishing wrongful discrimination in violation of Title

hired a white male to work full-time on the liner crew and paid him a higher hourly wage than Plaintiff (Mem. at 6); (2) Plaintiff was scheduled to work eight hours a day, each day, with "no days off," while employees in other departments had scheduled days off (*id.*); (3) Plaintiff was required to work overtime if he did not complete all of his work by the end of his shift (*Id.*); and (4) the trailers that Plaintiff lined contained racial graffiti. (*Id.* at 12.) However, because the court finds that Plaintiff has abandoned these claims, the court need not address WSI's arguments on the merits.

13. In ¶ 8 of his Amended Complaint, Plaintiff alleges that he was treated differently than white employees in the application of WSI's "disciplinary actions." (Am.Compl.¶ 8.) Plaintiff next asserts that the "conduct" of WSI "as described above" constitutes race discrimination, in violation of Title VII (Count 1) and § 1981 (Count 4). (*Id.* ¶¶ 13, 26.) Based on these allegations and because WSI's disciplinary procedures ultimately resulted in Plaintiff's termination (Brooks Aff. ¶ 4), the court finds that Plaintiff has satisfactorily pleaded a Title VII and § 1981 claim, alleging discriminatory discharge under a disparate treatment theory. In so finding, the court liberally construes the allegations in Plaintiff's Amended Complaint. Such a liberal construction is required to ensure the provision of substantial justice to the adjudication of this case. *See* Fed.R.Civ.P. 8(f) (stating that "[a]ll pleadings shall be so construed as to do substantial justice").

14. 42 U.S.C. § 1981 provides, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens."

VII and § 1981 is discriminatory intent. *See generally St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *see also Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 986, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988) (Title VII); *Baldwin v. Birmingham Bd. of Educ.*, 648 F.2d 950, 954 (5th Cir.1981) (§ 1981).[15] Discriminatory intent can be established through either direct or circumstantial evidence. *See United States Postal Serv. Bd. of Gov. v. Aikens*, 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

Where, as here, a plaintiff seeks to prove intentional discrimination through circumstantial evidence of the employer's intent, the court applies the familiar tripartite burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green* and *Texas Dept. of Comm. Affairs v. Burdine*. *See* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *See Combs v. Plantation Patterns*, 106 F.3d 1519 (11th Cir.1997). The purpose of the prima facie case is to show an adverse employment decision that resulted from a discriminatory motive. *See Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1143 (11th Cir.1983). If a plaintiff meets this burden, he or she is entitled to a legal presumption that the employer acted with discriminatory intent. *See Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *McDonnell Douglas*, 411 U.S. at 806, 93 S.Ct. 1817. The effect of this presumption is to shift to the employer the burden of producing a legitimate, nondiscriminatory reason for the challenged employment action. *See Combs*, 106 F.3d at 1528. This intermediate burden is "exceedingly light." *Meeks v. Computer Assocs. Int'l.*, 15 F.3d 1013, 1019 (11th Cir.1994); *Perryman*, 698 F.2d at 1142; *see also Turnes*, 36 F.3d at 1061. The employer "need not persuade

the court that it was actually motivated by the proffered reasons. It is sufficient if the [employer's] evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 254–55, 101 S.Ct. 1089); *see also Turnes*, 36 F.3d at 1061. Should the employer fail to meet its burden of production once the plaintiff establishes his or her prima facie case, "the unrebutted presumption of discrimination stands." *Turnes*, 36 F.3d at 1061 (*citing Joshi v. Florida State Univ. Health Ctr.*, 763 F.2d 1227, 1236 (11th Cir.1985)).

If the employer satisfies its burden, however, the presumption of discrimination disappears from the case. A plaintiff must then persuade the trier of fact that the employer's proffered reasons were pretextual and that the real reason for the adverse employment decision was, in fact, discriminatory. *See Burdine*, 450 U.S. at 253, 256, 101 S.Ct. 1089. "[T]he plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs*, 106 F.3d at 1528 (citations omitted). This may be accomplished by "either directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 1528.

### A. Abandoned Claims

WSI argues that, because Plaintiff's Response "is limited to issues regarding the termination of [Plaintiff's] employment," Plaintiff apparently has "conceded" all other issues in his Amended Complaint. (Reply at 1.) The court agrees. In opposing summary judgment, Plaintiff cannot rest on his pleadings. The nonmoving party

---

**15.** Decisions of the former Fifth Circuit rendered prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit.

*Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

must "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (citing FED.R.CIV.P. 56(e)). In other words,

> [t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.

*Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir.1995).

■ In moving for summary judgment, WSI filed a 35–page, fully-briefed Memorandum and a comprehensive evidentiary submission, which includes affidavits, deposition excerpts and numerous exhibits. After a careful examination of WSI's submission, the court finds that WSI has met its burden of informing the court of the basis for its Motion and of establishing, based on the evidence, that no genuine issue of material fact exists on all Plaintiff's claims. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (citing FED.R.CIV.P. 56(c)). In response to WSI's Motion, Plaintiff submitted a 2½ page response, with one case citation and three one-page exhibits. Therein, Plaintiff addresses only issues regarding his termination. Specifically, Plaintiff argues that WSI terminated him because of his race and "[i]n retaliation" for filing a charge with the EEOC. (Resp. at 1–2.) Plaintiff neither submits supporting evidence, nor addresses any other issue or claim.

Based on the foregoing, the court finds that Plaintiff has preserved only his Title VII and § 1981 claims alleging discriminatory discharge and retaliatory discharge. In other words, the court finds that Plaintiff has abandoned all claims, except the latter two, and that Plaintiff has not met his burden on summary judgment of

"go[ing] beyond the pleadings" and demonstrating "'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (citing FED. R.CIV.P. 56(e)). Accordingly, the court finds that WSI's Motion For Summary Judgment is due to be granted on all of Plaintiff's claims except his discriminatory discharge and retaliatory discharge claims.

### C. Discriminatory Discharge

■ Plaintiff premises his discriminatory discharge claim on his assertion that other non-minority employees who committed similar infractions escaped termination. In other words, Plaintiff alleges that his termination resulted from an unequal and discriminatory application of WSI's disciplinary procedures. (Am. Compl. ¶ 8; Resp. at 1–2.) Where an employer fires an employee for misconduct or a violation of the employer's policies, the employee must demonstrate the following to establish a prima facie case: (1) that he or she "belongs to a class protected under Title VII," (2) that he or she "was qualified for the job;" and (3) that the employee's "misconduct," which resulted in his or her termination, was "the same or similar to" the misconduct engaged in by a "similarly situated" non-minority employee who was not terminated. *Lathem v. Department of Children and Youth Servs.,* 172 F.3d 786, 792 (11th Cir.1999); *see also Jones v. Bessemer Carraway Medical Ctr.,* 137 F.3d 1306, 1311 n. 6 (11th Cir.1998), *modified on other grounds,* 151 F.3d 1321 (11th Cir.1998) (modifying *Jones v. Gerwens,* 874 F.2d 1534, 1540 (11th Cir.1989)).

It is undisputed that Plaintiff meets the first criteria of his prima facie case. Plaintiff, as a black male, is a member of a protected class. Moreover, under the second prong, the court will assume, for purposes of evaluating WSI's Motion, that Plaintiff was otherwise qualified for the job from which he was fired. Therefore, the court finds that Plaintiff has satisfied the first two elements of his prima facie case.

■ Although there is no dispute that WSI fired Plaintiff, WSI argues that Plaintiff's claim fails on the third criteria. That is, WSI argues that Plaintiff has not identified a similarly-situated, non-minority employee who was treated more favorably than Plaintiff. (Mem. at 25.) Plaintiff, however, points to Smith and Moorer, in arguing that he has met this prong.[16] (Resp. at 2–3.) For the reasons that follow, the court agrees with WSI. Under the third prong,

> to make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects. In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.

*Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997). "[T]he quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999).

In arguing that Smith and Moorer are not similarly-situated to Plaintiff, WSI does not dispute that Plaintiff, Smith and Moorer had to follow the same policies. Further, WSI does not dispute that Smith and Moorer violated the same work rule (i.e., WSI Policy, § 6.01–II–J) as Plaintiff, but were not disciplined as severely.

(Combs Aff. ¶ 21, Ex. 30; Brooks Aff. ¶¶ 7–9, Exs. 1, 3.) That is, Smith received an oral warning; Moorer received a written "First Warning"; and neither were fired as was Plaintiff. (*Id.*) Rather, WSI argues that, based on the differences in Smith and Moorer's disciplinary records, as compared to Plaintiff's, "Plaintiff cannot show that he was 'similarly situated.'" (Reply at 2–3.)

The record demonstrates that WSI had implemented a progressive discipline policy, where oral warnings proceeded written warnings and where two written warnings for the same violation within a year could result in termination. (Combs Aff. ¶ 21, Ex. 32.) Plaintiff, whose work conduct was governed by this policy, had received both an oral warning and a written "First Warning" less than four months prior to his alleged misconduct on January 2, 1998. (Combs' Aff. ¶ 19, Exs. 9 & 10.) Unlike Plaintiff, Smith had no prior disciplinary record; thus, Smith's infraction on December 26, 1997 was a first offense resulting in an oral warning. (Brooks' Aff. ¶ 9, Ex. 1.) Again, unlike Plaintiff, Moorer had only received one prior oral warning in November 1997, and thus, Moorer received a written "First Warning." (*Id.* ¶¶ 7–9, Ex. 3.) Based on the foregoing, the court finds that Plaintiff is not similarly situated to Smith and Moorer for the simple reason that Plaintiff had committed more infractions than Smith and Moorer. For lack of better words, under WSI's progressive discipline policy, Plaintiff was "a step ahead" of Smith and Moorer.[17]

In sum, because the record demonstrates that Plaintiff had a more extensive

---

**16.** As the court noted, *supra*, in footnote 3, Counsel for Plaintiff makes an unsworn assertion in a pleading that Moorer is a white male. (Resp. at 2.) However, the evidence in the record (i.e., Plaintiff's deposition testimony and Brooks' Affidavit) establishes that Moorer is a black male. Nonetheless, even assuming, for purposes of deciding WSI's Motion, that Moorer is outside Plaintiff's protected class, the court finds for the reasons set forth below that Moorer is not similarly situated to Plaintiff.

**17.** Additionally, the court notes that Plaintiff has not introduced any evidence indicating that the level of discipline imposed on Plaintiff, Moorer and Smith was contrary to WSI's progressive discipline procedure. Plaintiff likewise has not disputed that the misconduct that is the subject of his prior oral and "First Warning" did not happen.

record of disciplinary action than did Smith and Moorer, the court finds that Plaintiff has failed to produce evidence that Smith and Moorer were similarly situated in "all respects." *Holifield,* 115 F.3d at 1563. In other words, Plaintiff has not identified a single worker who could or should have been terminated instead of him, and has not pointed to any other workers with a performance record similar to his who were retained.[18] *See e.g., Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1186 (11th Cir.1984) (" 'If an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown.' ") (quoting *Chescheir v. Liberty Mutual Insurance Co.,* 713 F.2d 1142, 1148 (5th Cir.1983)). Based on the foregoing, the court finds that Plaintiff has failed to establish a prima facie case of discrimination. Accordingly, summary judgment is due to be granted in favor of WSI on Plaintiff's discriminatory discharge claim.

### D. Retaliatory Discharge

■ Plaintiff brings his retaliatory discharge claim under both Title VII and § 1981. Title VII's anti-retaliation provision provides as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). Although § 1981 does not specifically reference retaliation, this court has found that § 1981 encompasses claims of retaliation in the employment discrimination context. *Lightner v. Town of Ariton, Alabama,* 902 F.Supp.

1489, 1499 (M.D.Ala.1995) (DeMent J.). To establish a prima facie case of retaliation, Plaintiff must demonstrate the following: (1) that he engaged in "statutorily protected expression"; (2) that there was a "subsequent adverse employment action"; and (3) that "some causal relation" exists between the protected expression and the adverse action. *Donnellon v. Fruehauf Corp.,* 794 F.2d 598, 600–601 (11th Cir. 1986).

It is undisputed that Plaintiff meets the first prong because he filed a charge of discrimination with the EEOC against WSI. *See id.* (holding that the law is well-settled that an employee's "participation in an employment discrimination case," such as filing a charge of discrimination with the EEOC, is protected expression under Title VII and § 1981). Likewise, the court finds, and WSI does not dispute, that firing Plaintiff was an adverse employment action. Accordingly, Plaintiff has satisfied the first two elements of his prima facie case.

■ However, WSI contends that Plaintiff fails on the third prong of the prima facie case, because "Plaintiff cannot establish that his EEOC charge was the 'but for' cause of his termination." (Mem. at 33.) The court disagrees. In order to establish the requisite causal connection, " 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.' " *Meeks,* 15 F.3d at 1021 (quoting *Equal Employment Opportunity Comm'n v. Reichhold Chemicals,* 988 F.2d 1564, 1571–72 (11th Cir.1993)). The Eleventh Circuit has "plainly held that a plaintiff satisfies [the causal-connection] element if he [or she] provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this

---

**18.** In fact, it appears that, contrary to Plaintiff's assertion, Smith was treated the same as, not different from, Plaintiff. For instance, Smith's reprimand for violating WSI Policy, § 6.01–II–J, on December 26, 1997, is the

exact same disciplinary action taken against Plaintiff the first time he violated WSI Policy, § 6.01–II–J. That is, both Smith and Plaintiff received an oral warning. (Combs Aff. ¶ 19, Ex. 9; Brooks Aff. ¶ 7, Ex. 1.)

awareness and the adverse employment action." *Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322, 1336 (11th Cir.1999).

■ For the following reasons, the court finds that Plaintiff has satisfied the *Farley* requirement. First, it is undisputed that Brooks recommended Plaintiff's termination and that, when Brooks made the recommendation, he was aware that Plaintiff had filed an EEOC charge against WSI. Brooks admits these facts. (Brooks Aff. ¶¶ 4–5.) WSI further concedes that, "a few days" after Plaintiff filed his charge with the EEOC, it "received notice" of Plaintiff's charge. (Mem. at 12.) Based on the foregoing, there is no dispute, and the court so finds, that WSI was "aware of the protected conduct" when it fired Plaintiff. *Farley,* 197 F.3d at 1337.

Second, the record reveals that Plaintiff filed a charge of discrimination with the EEOC on or about December 12, 1997. (Mem. at 12; Am.Compl. ¶ 10.) Approximately one month later, on January 15, 1998, WSI terminated Plaintiff's employment. (Combs Aff. ¶ 16.) The courts finds that the one-month span between the filing of Plaintiff's EEOC charge and Plaintiff's termination constitutes a "close temporal proximity" sufficient to establish a causal connection between the protected activity and termination. *Farley,* 197 F.3d at 1337 (holding that, where the plaintiff filed an EEOC charge on May 19, 1995 and was terminated seven weeks later, "this timeframe" was "sufficiently proximate to create a causal nexus for purposes of establishing a prima facie case"); *see also Donnellon,* 794 F.2d at 600–601 (holding that the plaintiff had established the "causal link" prong of the prima facie case, where her discharge occurred one month after filing a charge with the EEOC: "The short period of time ... between the filing of the discrimination complaint and the plaintiff's discharge belies any assertion by the defendant that the plaintiff failed to prove causation."). Therefore, the court concludes that Plaintiff has sufficiently es-

tablished the third element of his prima facie case of retaliation.

■ The burden now shifts to WSI to " 'articulate' a legitimate, non-discriminatory reason for its action." *Schoenfeld v. Babbitt,* 168 F.3d 1257, 1267 (11th Cir. 1999) (quoting *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089). An employer's good faith, but incorrect, belief that an employee violated a work rule can constitute a non-discriminatory reason for that employee's termination. *Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1363 n. 3 (11th Cir.1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."); *see also Sunstrom v. Schering–Plough Corp.,* 856 F.Supp. 1265, 1268–69, 1272 (E.D.Tenn. 1994) (finding that the employer satisfied its burden of stating a non-discriminatory reason for the plaintiff's termination where the employer "honestly believed" that the plaintiff had falsified company records to exaggerate her sales activities). As the Eleventh Circuit has "repeatedly and emphatically held," an employer "may terminate an employee for a good or bad reason without violating federal law." *Damon,* 196 F.3d at 1361. Courts are "not in the business of adjudging whether employment decisions are prudent or fair. Instead, [the courts'] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Id.*

As reasons for terminating Plaintiff, WSI asserts that Plaintiff "violated company rules by leaving work early without permission and by falsifying his time card. These offenses, combined with an earlier written warning, were the reason for his discharge." (Reply at 1; Mem. at 33.) WSI further explains, that while Plaintiff offered "excuses" for his conduct, WSI did not find his explanations "valid." (Brooks Aff. ¶ 17.) Namely, when Plaintiff was suspended on January 8, 1998, Brooks "investigated" Plaintiff's alleged infractions

and reached two conclusions. (*Id.* ¶ 4.) First, in regard to Plaintiff leaving his shift early, Brooks did not believe Plaintiff's "claimed confusion" about his work schedule, in part, because Plaintiff's "co-worker" remained on the job. (*Id.* ¶ 11.) Second, Brooks did not believe Plaintiff's representation that he was required to submit his time card "in advance," because "time cards were not submitted early" on January 2, 1998.[19] (*Id.* ¶ 15.) Brooks thereafter concluded that Plaintiff's termination was "warranted." (*Id.* ¶ 4.) In sum, Brooks states that his decision to recommend Plaintiff's termination had nothing to do with Plaintiff's race but, rather, was based solely on legitimate, non-discriminatory reasons. (*Id.* ¶ 5.)

Based on the foregoing, the court finds that WSI satisfies its "exceedingly light" burden of producing evidence of legitimate non-discriminatory reasons for Plaintiff's termination. *Perryman,* 698 F.2d at 1142. In other words, the court finds that, based on Brooks' explanations, WSI at the very least had a good faith belief that Plaintiff had violated company policies.

Now the court examines whether Plaintiff can meet his "burden of persuading the court that the proffered reason[s] for the employment decision [are] a pretext for intentional discrimination." *Jordan v. Wilson,* 649 F.Supp. 1038, 1054 (M.D.Ala. 1986). To carry his burden, Plaintiff must "create a genuine issue of material fact as to whether the reasons advanced are pretextual." *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1332 (11th Cir.1998). At the summary judgment stage, an employer's assertion that an employee was fired for violating a "'work rule' ... is arguably pretextual when [the employee] submits evidence (1) that [he or] she did not violate the cited work rule, or (2) that if [he or] she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated." [20] *Damon,* 196 F.3d at 1363.

In asserting that WSI's reasons for terminating him are pretextual, Plaintiff advances both types of argument espoused in *Damon.* First, Plaintiff argues that Smith and Moorer are similarly-situated employees outside his protected class who violated the same work rule as Plaintiff, but were not terminated.[21] (Resp. at 1–2.) For the same reasons discussed in Section IV. C. above, the court disagrees. That is, the court finds that, based on the differences in Smith and Moorer's disciplinary records as compared to Plaintiff's disciplinary record, neither Smith nor Moorer are similarly situated to Plaintiff. According-

---

**19.** As explained by Brooks:

time cards are ordinarily submitted on Monday. WSI deviated from that schedule in the last two weeks of December 1997. That year Christmas and New Years days were on Thursday, the regular pay day. To be able to pay employees on Wednesday before these holidays, time cards for those weeks were submitted on Friday with time for Saturday and Sunday estimated according to the employee[']s work schedule. Those holidays were over by the time [Plaintiff] reported to work on January 2. As a result WSI returned to its regular schedule and time cards were submitted on Monday, January 5, with actual time worked rather than estimated time for Saturday and Sunday.

(Brooks Aff. ¶ 16.)

**20.** As further explained by the Eleventh Circuit,

this framework is simply used to assess whether a plaintiff has presented sufficient evidence to establish pretext—that is, the employer has not given an honest explanation of the employer's behavior—and thereby reach a jury on the ultimate question of discrimination. This framework, however, does not vitiate a plaintiff's ultimate burden to prove by a preponderance of the evidence that an employer terminated the plaintiff based on a discriminatory motive. *Damon,* 196 F.3d at 1363 n. 3.

**21.** In retaliation cases, employees outside Plaintiff's protected class encompass individuals who did not file a charge with the EEOC. *See Pollard v. Montgomery County,* 66 F.Supp.2d 1218, 1228 (M.D.Ala.1999). Hence, unlike Plaintiff's discriminatory discharge claim, discussed in Section IV. C., the race of Smith and Moorer is immaterial for purposes of evaluating Plaintiff's retaliatory discharge claim.

ly, the court rejects Plaintiff's first argument as evidence of pretext.

■ Second, Plaintiff alleges that WSI's proffered reasons for his termination are subterfuge, because the events did not happen in the manner in which WSI describes. In so arguing, however, Plaintiff concedes the technical occurrence of the events advanced by WSI. That is, Plaintiff admits that he left work on January 2, 1998 at 5:00 p.m. and that his time card inaccurately reflects that he worked until 8:00 p.m. (Pl.'s Dep. at 30, 41–42.) Nonetheless, Plaintiff states that he left his shift early, because he legitimately believed that his shift hours had changed. (*Id.*) He further states that his supervisor confirmed that the shift hours had been changed "at the last minute." (*Id.* at 42.) Plaintiff also states that he is not at fault for the incorrect time card, because his supervisor told him that he would "take care" of changing Plaintiff's time card. (*Id.*) Under these circumstances, Plaintiff alleges that he should not be held accountable for the cited infractions, because he acted at the direction of his supervisor and relied on his supervisor's assurances.

Based on the foregoing, the court finds that Plaintiff has presented evidence which would allow a reasonable jury to disbelieve WSI's contention that it terminated Plaintiff because it honestly believed that Plaintiff purposefully left his shift early and willfully overstated the hours on his time card. Accordingly, the court finds that factual issues remain precluding summary judgment.[22]

### ORDER

For the reasons stated herein, it is CONSIDERED and ORDERED that WSI's Motion For Summary Judgment be and the same is hereby DENIED on Plaintiff's retaliatory discharge claim brought under Title VII (Count 3) and

§ 1981 (Count 5) and GRANTED as to the remaining counts in Plaintiff's Amended Complaint (Counts 1, 2 and 4.)

---

**22.** The court emphasizes that its duty at this juncture is not to weigh the evidence or question its veracity, *see Anderson,* 477 U.S. at 249, 106 S.Ct. 2505; rather, the court must only eliminate claims upon which no rational jury could find for Plaintiff. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.